```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                      WESTERN DIVISION
```
_____

```
UNITED STATES OF AMERICA,      )
                               )
     Plaintiff,                )
                               )
v.                             )
                               )   No. 09-20070-Ma/P
MARVIN SMITH,                  )
                               )
     Defendant.                )
                               )
```
_____

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**
_____

Before the court by order of reference is defendant Marvin Smith's Motion to Suppress Evidence. (D.E. 51.) Pursuant to the order of reference, the court conducted a suppression hearing on the motion. At the hearing, the court heard testimony from Memphis Police Department ("MPD") Officer Star Handley, MPD Sergeant John Pasley, MPD Detective Brandon Champagne, and defendant Marvin Smith. The court admitted as evidence Smith's written statement. Based on the briefs filed in support of and in opposition to the motion, the evidence presented at the hearing, and the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress be denied.

### I.   PROPOSED FINDINGS OF FACT

**A.   Officers' Version of Events**

On November 6, 2008, Officer Star Handley met with a confidential informant to discuss weapons sales by an individual known to the informant only as "Mac Chico."[1] The informant provided Officer Handley with the following physical description of Mac Chico: a black male, approximately 6'3" or 6'4" tall, large build, medium to light complexion, approximately thirty-five to forty years old, and with a close-cropped or low haircut. The informant stated that Mac Chico wanted to sell firearms to the informant. The informant advised Officer Handley that Mac Chico was possibly a convicted felon and that he was a member of the Gangster Disciples street gang.[2] Subsequently, the informant and Mac Chico spoke on the telephone approximately three times to arrange an illegal sale of a handgun and an assault rifle. These conversations were conducted on a speaker phone in the presence of Officer Handley, so that Officer Handley could hear both sides of the conversation. The informant told Mac Chico that he (the informant) had been recently released from the penitentiary.[3] Mac

---

[1] Officer Handley previously received reliable information from this confidential informant in other cases. The information Officer Handley obtained in these cases resulted in several drug seizures, asset seizures, and state and federal prosecutions.

[2] The informant's belief that Mac Chico was a convicted felon was based on conversations with Mac Chico, in which Mac Chico bragged about his various arrests and convictions for weapons and drug charges. The officers later discovered after the defendant's arrest that he was not a convicted felon.

[3] The confidential informant was, in fact, a convicted felon.

Chico offered to sell the informant one revolver and one assault rifle, and advised the informant that he would meet the informant at the Villa Inn Motel, located at 3283 South Third Street in Memphis, Tennessee, at 3:00 p.m. that same day.  Mac Chico stated that he would arrive in a late-model grey or silver Ford Taurus.

Sergeant Pasley, Detective Champagne, and other officers set up surveillance at the Villa Inn.  At approximately 3:40 p.m., officers observed a black male driving a late-model grey Ford Taurus, accompanied by a male passenger in the front seat, pull into the parking lot at the Villa Inn.  As the driver got out of the Taurus, Sergeant Pasley and Detective Champagne observed that his physical appearance was consistent with the description of Mac Chico they had received from the informant.  The driver started walking towards Room 109, where the firearms deal with the informant was scheduled to take place.

Sergeant Pasley, who was wearing gear marked as "police," exited his unmarked police vehicle and approached Mac Chico from behind.  Sergeant Pasley observed a large bulge protruding from the back right-side waistband area of Mac Chico's pants, which Sergeant Pasley believed to be a firearm.  Sergeant Pasley verbally identified himself as "police" and ordered Mac Chico to the ground. Mac Chico immediately raised his arms, and as his shirt lifted up, Sergeant Pasley observed the exposed brown wooden butt of a handgun

sticking out from the back right-side of Mac Chico's waistband.[4] Sergeant Pasley removed the gun from Mac Chico's waistband, handcuffed him, and patted him down.  In Mac Chico's front right pocket, Sergeant Pasley discovered a small clear plastic baggie containing marijuana.  He also found two rubber gloves, along with other personal items.

Sergeant Pasley did not question Mac Chico as he was being handcuffed.  However, Mac Chico began making statements relating to the handgun.  He stated that he was supposed to sell the gun to an individual in Room 109.  Sergeant Pasley, who was standing right in front of Room 109, stated "let's knock on the door."[5]  When nobody answered Sergeant Pasley's knock, Mac Chico stated that he had been set up and that the person who he was attempting to sell the gun to was not who he claimed to be.  Mac Chico also stated that he had the rubber gloves because he did not want his fingerprints on the gun.  The officers subsequently learned that Mac Chico's true name was Marvin Smith.

As Sergeant Pasley detained Smith, Detective Champagne approached the passenger side of the Ford Taurus.  He looked in the back window and saw a black rifle case lying on the floorboard in

---

[4]Sergeant Pasley testified that as "soon as [Mac Chico's] hands went up, his T-shirt went up, and you could see the pistol, .22 revolver sticking out of the waistband."

[5]Sergeant Pasley knew at the time that Room 109 was empty, and that the informant was with Officer Handley in a secure location across the street from the Villa Inn.

plain view between the back seat and the console. At that time, he ordered the passenger of the vehicle, Antonio Jones, out of the car and detained him for safety purposes. Officer Handley, who by this time had arrived on the scene, retrieved the rifle case from the car and discovered a Remington hunting rifle inside. No assault rifles were found inside the Taurus.

Subsequently, Smith was taken to the MPD Organized Crime Unit office and questioned by Officer Handley and Detective A. Clark. Smith was read his Miranda warnings, and he waived his rights and agreed to talk to the officers. Smith told the officers that he intended to sell the revolver and rifle to an individual who was recently released from the penitentiary and who needed firearms. Smith admitted that the marijuana found in his pocket was his, and stated that he had been smoking marijuana for approximately ten or eleven years. Smith stated that this arrest at the Villa Inn was his fifth arrest for firearms charges, that the handgun was retrieved from his side waistband "closer to the back," that he was a member of the Gangster Disciples street gang, and that he was on probation. Smith's Miranda warnings and statement were reduced to writing, and he initialed and signed the rights waiver and statement.

**B.   Smith's Version of Events**

Smith testified at the suppression hearing and admitted that he had a handgun on his person as he approached Room 109. However,

he testified that, contrary to Sergeant Pasley's testimony, the handgun was not located on the back right-side of his waistband. Instead, he had two cell phones on his waistband in the area that Sergeant Pasley testified he initially saw the handgun.  Smith testified that the gun was actually hidden inside of the front of his jeans, on the left side.[6] As he got out of the Taurus, the gun started to slide down his left leg, and he had to grab the gun to prevent it from sliding all the way down his jeans.

After Smith was on the ground, Sergeant Pasley handcuffed Smith and asked him what personal belongings and illegal items he had on him.  Sergeant Pasley then searched Smith while Smith was handcuffed and pulled a bag of marijuana out of Smith's right pocket.  After Sergeant Pasley found the marijuana, Sergeant Pasley continued to search him and found Smith's gun, rubber gloves, and other personal items.

Next, Officer Handley spoke with Smith and took pictures of him.  At this time, Smith was handcuffed but had not been given his <u>Miranda</u> warnings.  Officer Handley, who apparently recognized Smith, asked Smith where he (Officer Handley) knew him from, to which Smith replied that Officer Handley had assaulted him in an alley during a prior arrest.  Officer Handley then asked Smith if

---

[6]This testimony directly contradicts his written statement, in which Smith stated that the handgun was located "[o]n my side waistband closer to the back."

he could search his car, and Smith said yes.[7]  Officer Handley also asked Smith what was in his car, and Smith responded that there was a rifle case in the car.  Officer Handley asked Smith what he was doing at the Villa Inn, and Smith stated that he got a call from an individual stating that somebody he knew wanted to buy a gun and that the individual told him to meet at Room 109 at the Villa Inn to conduct the transaction.[8]

**C.   Credibility of the Witnesses**

The court has carefully considered the testimony of all of the witnesses, including the witnesses' demeanor as they testified at the hearing, and finds the government's witnesses to be credible and Smith to be not credible.  Therefore, the court adopts the officers' version of the events as its Proposed Findings of Fact.

## II.   PROPOSED CONCLUSIONS OF LAW

**A.   Investigative Detention of Smith**

Smith contends that the investigative detention violated his Fourth Amendment rights.  Specifically, Smith argues that:

> [T]he encounter with the deputies was not consensual. Mr. Smith was ordered to the ground by an officer exiting an unmarked vehicle. The encounter was not supported by a reasonable, articulable suspicion of criminal activity.

---

[7]Although Smith claims that he gave the officers consent to search his car, none of the government's witnesses testified that they asked for consent or that Smith gave his consent.

[8]Officer Handley testified that Smith looked familiar and that he asked Smith how he knew him.  However, according to Officer Handley, no further questions were asked of Smith until he was brought to the police station and read his <u>Miranda</u> warnings.

> The deputies observed no criminal activity by Mr. Smith. The deputies had no probable cause to make an arrest.

(Def.'s Mot. at 3.)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. CONST. AMEND. IV.  The Fourth Amendment does permit a brief investigatory stop of an individual if the officer has a "reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).  A police officer possesses the necessary "reasonable, articulable suspicion" to conduct an investigative stop if that officer is able to express "some minimal level of objective justification for making the stop." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting INS v. Delgado, 466 U.S. 210, 217 (1984)).

There are three types of permissible encounters between police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000) (citing United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997))

(citations omitted).  In analyzing the second type of encounter, also known as a Terry stop, the Supreme Court has explained that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior even though there is no probable cause to make an arrest."  Adams v. Williams, 407 U.S. 143, 145 (1972) (citing Terry, 392 U.S. at 22).  The court in Adams stated that:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, [T]erry recognizes that it may be the essence of good police work to adopt an intermediate response.  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

Id. at 145-46 (citations omitted).

When evaluating the constitutionality of a Terry stop, a court engages in a two-part analysis of the reasonableness of the stop. First, it asks whether there was a proper basis for the stop, which is judged by examining whether the police officers were aware of specific and articulable facts which gave rise to reasonable suspicion.  Second, if the stop is deemed proper, then the determination is made whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officer's conduct

given their suspicions and the surrounding environment and circumstances. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). If reasonable suspicion does exist, officers are entitled to briefly detain an individual for investigative purposes and conduct a limited pat-down search of the suspect's outer clothing for weapons if the officer has a reasonable belief that the suspect poses a threat to the officer's safety or safety of others. Terry, 392 U.S. at 23-24, 27, 30.

The court finds that the officers' conduct satisfies the two-part test. First, the court finds that, based on the totality of the circumstances, there was a proper basis for the officers' stop of Smith. The officers received information from a reliable informant that Mac Chico wanted to sell a handgun and an assault rifle to the informant; they were given a physical description of Mac Chico and learned that he might be a convicted felon and a member of the Gangster Disciples; Officer Handley corroborated the informant's information by listening to several phone conversations between the informant and Mac Chico about the proposed firearms transaction; a black male matching Mac Chico's description and driving a vehicle matching the description given by Mac Chico appeared at the Villa Inn as planned; the driver walked towards Room 109, where the gun sale was scheduled to take place; and it appeared to Sergeant Pasley that the driver had a gun tucked in his waistband. Based on these specific and articulable facts known to

the officers, they had reasonable suspicion that Smith was in the process of conducting an illegal firearms transaction and unlawfully possessing a firearm.

Second, because there was a proper basis for the stop, the court must analyze whether the degree of intrusion was reasonably related in scope to the situation at hand. Smith was thought by law enforcement to be a felon and a member of the Gangster Disciple; he was at the motel to conduct an illegal firearms transaction; one of the firearms that was supposed to be sold to the informant was an assault rifle; and it appeared that Smith had a gun in his waistband. These circumstances justified the officers' need to approach Smith with their guns drawn and to order him to the ground for officer safety. Finally, once Smith raised his arms and Sergeant Pasley saw the gun in his waistband, he had probable cause to arrest Smith.

### B. Seizure of Revolver and Rifle

Law enforcement officers may seize items in "plain view," assuming that the officer is lawfully present and the incriminating character of the items is "immediately apparent." See, e.g., Horton v. California, 496 U.S. 128 (1990); United States v. Bradshaw, 102 F.3d 204, 210-11 (6th Cir. 1996). "A police officer who discovers a weapon in plain view may, at least temporarily, seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate

threat to officer or public safety." United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003). Here, the plain view doctrine authorized Sergeant Pasley to seize Smith's handgun. When Sergeant Pasley ordered Smith to the ground, Smith's first reaction was to put his hands up, and Sergeant Pasley observed the butt of the handgun sticking out from his waistband. Thus, Sergeant Pasley was authorized to seize the weapon. See, e.g., United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996) (officer's seizure of weapon in "plain view" protruding from driver-side console of car deemed valid); United States v. Morton, 17 F.3d 911, 913-14 (6th Cir. 2004) (officer's seizure of weapon in "plain view" from defendant's rear pocket deemed valid). Sergeant Pasley was also authorized to seize the handgun (and marijuana) as part of his search incident to a lawful arrest. Chimel v. California, 395 U.S. 752 (1969).

Further, the seizure of the rifle from the back seat of the Taurus was authorized as both a search incident to arrest and by the automobile exception. First, "[p]olice may search a vehicle incident to a recent occupant's arrest only if . . . it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 129 S. Ct. 1710, 1723 (2009); see also United States v. Allen, No. 4:08-cr-40, 2009 WL 3297286, at *2 (E.D. Tenn. Oct. 13, 2009) (applying Gant). The officers had probable cause to arrest Smith for unlawful possession of a firearm

and engaging in the illegal sale of a firearm, and once the officers looked through the rear window of the Ford Taurus and saw the rifle case in "plain view," they were justified in conducting a warrantless search of the vehicle because they had a reasonable belief that the vehicle contained evidence relating to the offense of arrest.

Second, the seizure of the rifle was also authorized by the automobile exception. An exception to the warrant requirement exists through which police may search readily mobile automobiles if the police have probable cause to be believe that the vehicle contains evidence of some crime. United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (citations omitted); see also Carroll v. United States, 267 U.S. 132, 146-154 (1925) (introducing automobile exception to warrant requirement). The automobile exception is justified not only because the automobile may be easily moved out of the jurisdiction before a warrant can be procured, but also because "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." South Dakota v. Opperman, 428 U.S. 364, 367 (1976). In the present case, the officers had probable cause to believe that the vehicle contained evidence of a crime when they observed the rifle case in plain view. Therefore, the officers were justified in seizing the rifle under the automobile exception.

**C.    Pre-Miranda and Post-Miranda Statements**

1.   Pre-Miranda Statements

Statements that are voluntarily made by a defendant while in police custody do not implicate Miranda. Rhode Island v. Innis, 446 U.S. 291, 300 (1980) ("[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not implicated by Miranda"); United States v. Murphy, 107 F.3d 1199, 1204-05 (6th Cir. 1997) (statements voluntarily made by defendant in custody in police car deemed admissible even though Miranda warnings not given); United States v. Montano, 623 F.2d 147, 149 (6th Cir. 1980) (defendant's voluntary statements made without pressure or questioning deemed admissible even though Miranda warnings not given).

After Sergeant Pasley handcuffed Smith at the Villa Inn, Smith immediately stated that he had the gun because he was supposed to sell it to an individual in Room 109. Smith further stated that he had rubber gloves because he did not want his fingerprints on the gun. These were voluntary statements made by Smith, and were not made in response to any questions asked by any of the officers. Thus, because no questioning took place by the officers to elicit these statements, the statements should not be suppressed.

2.   Post-Miranda Statements

Finally, Smith argues that his written statement should be suppressed, although it is unclear from his motion why he believes his post-Miranda statement should be suppressed. The evidence shows

-14-

that Smith was given his Miranda warnings before he was questioned by the officers, he signed a form stating that he understood his rights and that he waived his rights, and he gave a written statement that was reduced to writing and which he signed. Smith does not argue that his statement was obtained as a result of police coercion, and there is no evidence of any such coercion in this case.

### III.  CONCLUSION

For the reasons above, the court recommends the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

November 19, 2010
Date

### NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(c).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.